

FILED
IN OPEN COURT

SEP - 8 2022

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAFAEL ANTONIO PINEDA SANTOS,<br>a/k/a "Tony Santos," and "Tony Pineda,"<br><br>Defendant. | No. 1:14-cr-135 |

STATEMENT OF FACTS

The United States and the defendant, Rafael Antonio Pineda Santos, stipulate that the allegations in Count One of the Superseding Indictment and the following facts are true and correct, and that had the matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1. From in and around 2005 to on or about June 19, 2014, both dates being approximate and inclusive, within the jurisdiction of the United States and in an offense begun and committed outside the jurisdiction of a particular state or district, the defendant, RAFAEL ANTONIO PINEDA SANTOS, who was first brought to the Eastern District of Virginia, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with others, known and unknown, to unlawfully, knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 and 846.

2. During the time period from 2005 until at least June 2014, Miguel Arnulfo Valle Valle ("Arnulfo") and his brother Luis Alonso Valle Valle ("Luis") were the leaders of an international drug trafficking organization based in Honduras known as the "Los Valles" Drug

1

Trafficking Organization, and hereinafter referred to as the "Valle DTO." As the leaders of the Valle DTO, Arnulfo and Luis conspired with others to import multi-ton quantities of cocaine from Central America to the United States. Under the leadership of Arnulfo and Luis, the Valle DTO moved large multi-hundred kilogram loads of cocaine from Honduras to Guatemala and on into Mexico for importation into, and distribution within, the United States. The Valle DTO used helicopters and commercial trucks to transport these large loads of cocaine over land from Honduras to Guatemala. From Guatemala, the cocaine was transferred to co-conspirators associated with Mexican drug trafficking organizations, who caused the cocaine to be smuggled into the United States and redistributed. In addition to moving large loads of cocaine through Central America for ultimate distribution in the United States, some members of the Valle DTO imported smaller quantities of cocaine from Honduras directly into the United States using human couriers, who would travel on commercial airliners with the cocaine secreted inside wooden frames, shoes, and other seemingly innocuous items.

3. In furtherance of this conspiracy, Arnulfo and Luis often would invest in multi hundred-kilogram loads of cocaine, which were shipped regularly from Colombia to Central America via non-commercial aircraft and maritime shipping routes. Other times, Arnulfo and Luis did not invest in loads, but were paid a transportation fee to move loads through Central America. Arnulfo and Luis facilitated the sale and/or transportation of these large loads of cocaine to co-conspirators in Guatemala and Mexico. Arnulfo and Luis were assisted by co-conspirators in transporting these loads.

4. The Valle DTO maintained an arsenal of firearms to protect and further their operation and relied on violence, including kidnapping and murder, as a means of intimidation.

The Valle DTO also exercised influence over individuals acting within an official capacity in Honduras by means of bribery, threats, intimidation, and violence.

5. The defendant, RAFAEL ANTONIO PINEDA SANTOS, was a member of the Valle DTO, who was paid by Arnulfo and Luis to provide information about the status of possible law enforcement cooperators and pending law enforcement actions against the Valle DTO. The defendant maintained an extensive network through which he obtained information that he provided the Valle DTO to further the conspiracy. He contacted Arnulfo and Luis to advise them of planned raids or surveillance being conducted against the Valle DTO.

6. In furtherance of the conspiracy, Arnulfo and Luis would pay the defendant and other co-conspirators in return for information about raids and asset seizures; law enforcement tactics, techniques, and procedures; and individuals suspected of cooperating with law enforcement. This information enabled Arnulfo, Luis and the Valle DTO to avoid law enforcement detection. Arnulfo and Luis also would pay bribes to Honduran police officials to facilitate transporting cocaine loads through police checkpoints in Honduras without being stopped, searched, and seized.

7. Members of the conspiracy, to include the defendant, Arnulfo and Luis, relied on various forms of communication, including cellular phone voice calls, text messaging, Blackberry PIN to PIN communications, and in-person meetings to communicate with one another. To avoid detection by law enforcement, some members of the conspiracy took certain precautions with regard to their communications, to include frequently changing phone numbers and devices, using Blackberry Messenger communications, subscribing to their devices in false names or aliases, and speaking in code when discussing cocaine trafficking and associated crimes.

8. On or about March 22, 2012, members of the Valle DTO sent approximately 3.1 kilograms of cocaine into the United States, employing a courier who entered the United States on a flight from Honduras to Dulles International Airport in Sterling, Virginia, within the Eastern District of Virginia.

9. On or about February 11, 2014, the defendant obtained identifying information about law enforcement cooperators from an associate in exchange for $1,500. That day, Arnulfo communicated with a co-conspirator over Blackberry PIN messaging regarding a payment to the defendant. The co-conspirator told Arnulfo that "LV [referring to Luis Valle] says to give tony $1,500." Arnulfo responded, "[h]e [referring to Tony Santos] is going to Teg [referring to Tegucigalpa] to give to a friend over there." This call reveals that Arnulfo coordinated with the Luis and a co-conspirator for payment to be made to the defendant to obtain confidential information.

10. On or about February 13, 2014, the defendant sent a PIN message to Arnulfo, advising that he was leaving Tegucigalpa, and the "visit was very positive."

11. On or about February 28, 2014, the defendant provided information to Arnulfo about a pending law enforcement action against Luis, Arnulfo, and the Valle DTO, as well as information identifying an individual who had cooperated with law enforcement against the Valle DTO. Arnulfo paid for the information by instructing that money be provided to one of the defendant's sources of information.

12. On or about March 4, 2014, the defendant provided Arnulfo with the identity of a person who the defendant said was cooperating with law enforcement against the Valle DTO.

13.   On or about March 13, 2014, the defendant provided Arnulfo with information about imminent law enforcement surveillance of one of the Valle DTO's properties, where the defendant said law enforcement was looking for a suspected narcotics laboratory.

14.   On or about April 1, 2014, the defendant communicated with Luis over Blackberry messaging about the defendant's efforts to divert law enforcement efforts away from the Valle DTO. At the time, Honduran law enforcement authorities were involved in conducting raids and surveillance at properties associated with the Valle DTO. Luis told the defendant, in substance, that he (Luis) spoke to his brother (Arnulfo) and confirmed that the initial trouble with law enforcement officials had improved. The defendant relayed that he sent Luis a voicemail from "the friend Coro" [Colonel]. Luis responded, "Thank God that you got them out of there."

15.   It was reasonably foreseeable to the defendant that his co-conspirators distributed in furtherance of the conspiracy at least 50 kilograms of cocaine.

16.   This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

17.   The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

18.     If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement in any such proceeding.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: August 30, 2022

By: *[signature]*
Rachael C. Tucker
Assistant United States Attorney

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, RAFAEL ANTONIO PINEDA SANTOS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that if the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date 08-SEP-2022

_____
Rafael Antonio Pineda Santos
Defendant

<u>Defense Counsel's Signature</u>: I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is informed and voluntary.

Date 9/8/2022

_____
Sandi Rhee
Attorney for the Defendant

7